[No. 45060. En Banc. November 22, 1978.]

WEYERHAEUSER COMPANY, *Appellant*, v. SOUTHWEST AIR POLLUTION CONTROL AUTHORITY, *Respondent.*

*Jane Hotneier Wilkinson*, for appellant.

*James D. Ladley* and *Boettcher, LaLonde, Kleweno, Dunn, Ladley, Witteman, Schreiber & Kelly*, for respondent.

Hicks, J.—Weyerhaeuser Company challenges the denial of its application to construct an air contaminant source. The Southwest Air Pollution Control Authority (SWAPCA) rejected Weyerhaeuser's application because it failed to specify appropriate means of air pollution control.

Weyerhaeuser proposed to modernize its Longview lumber mill by replacing or revising three lines of planing and trimming equipment. The new equipment was to have essentially the same design and serve the same purpose as that which it would replace. The proposal for revision included three cyclonic separators as means of air pollution

control. These separators incorporated some technological advances over the systems they would replace, but would apparently be only marginally more efficient in controlling emissions.

Pursuant to RCW 70.94.152(1) of the Washington clean air act and SWAPCA Reg. 1, § 3.01(a), Weyerhaeuser filed an "Application for Approval to Construct, Install, Establish or Alter an Air Contaminant Source Facility". Although SWAPCA found that the revisions contemplated by Weyerhaeuser met all "emission standards", it denied the application because the proposed control devices did not incorporate "advances in the art of" air pollution control. SWAPCA Reg. 1, § 3.03(b). SWAPCA recommended bag filtration (baghouse) or wet scrubbing control systems which are substantially more effective in controlling potential emissions. The recommended systems are less desirable than the proposed cyclonic systems in some respects however, including the cost of installation and maintenance, secondary environmental impacts, energy consumption and safety hazards.

SWAPCA issued an "Order of Prevention" which was subsequently affirmed by the agency's board of directors in an administrative order. Both orders were appealed to the Pollution Control Hearings Board (PCHB) which, after a hearing, affirmed with its own order. On appeal under RCW 34.04.130 to the superior court, the decision of the PCHB was affirmed. Weyerhaeuser appealed directly to this court pursuant to RCW 43.21B.190.

The appeal raises two questions: (1) Was Weyerhaeuser denied due process of law because SWAPCA acted without the guidance of definite objective standards? (2) Was SWAPCA's rejection of Weyerhaeuser's application clearly erroneous and/or affected by errors of law?

As to the first question, we note that Weyerhaeuser does not challenge the legislature's action in delegating its authority to SWAPCA to enforce certain air contaminant control requirements. RCW 70.94.152. Weyerhaeuser does challenge the manner in which SWAPCA exercised that

delegated authority. Weyerhaeuser contends that SWAPCA has failed to promulgate definite, meaningful standards, thus depriving applicants of due process requirements. It argues that definitive numerical emission criteria are both feasible and desirable in this instance, and should therefore be judicially mandated.

In *Barry & Barry v. Department of Motor Vehicles*, 81 Wn.2d 155, 161, 500 P.2d 540 (1972), we quoted the following with approval:

> The non–delegation doctrine can and should be altered to turn it into an effective and useful judicial tool. Its purpose should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards; its purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power. . . . The focus of judicial inquiries thus should shift from statutory standards to administrative safeguards and administrative standards. As soon as that shift is accomplished, the protections should grow beyond the non–delegation doctrine to a much broader requirement, judicially enforced, that as far as is practicable administrators must structure their discretionary power through appropriate safeguards and must confine and guide their discretionary power through standards, principles, and rules.

1 K. Davis, *Administrative Law Treatise* § 2.00 (Supp. 1970).

*Barry & Barry* concerned only the first step toward alteration of the nondelegation doctrine, *i.e.,* modification of the doctrine so as not to unduly restrict the legislature in delegating its authority to an administrative agency. In the present case, we must determine whether an administrative agency has adequately structured its discretionary power through appropriate standards and safeguards.[1]

The relevant SWAPCA regulation provides that an application to construct a contaminant source will not be approved unless the information supplied demonstrates

---

[1]For a general discussion of the purposes served by administrative standards, *see Sun Ray Drive–In Dairy, Inc. v. Oregon Liquor Control Comm'n,* 16 Ore. App.

that the proposed pollution control equipment "incorporates advances in the art of air pollution control developed for the kind and amount of air contaminant emitted by the equipment." SWAPCA Reg. 1, § 3.03(b)(2). We do not consider this regulation in isolation, however. It is incumbent upon SWAPCA to comply with all requirements of the clean air act. RCW 70.94.170. Under RCW 70.94.152(1), SWAPCA must issue an order for the prevention of any construction which "will not provide all known available and reasonable means of emission control . . ." The PCHB found the statutory and regulatory standards to be equivalent under the facts of this case. Weyerhaeuser does not challenge that determination and agrees that "advances in the art" required utilization of "all known available and reasonable methods."

The regulation and the statute are clearly meant to foster the use of new emission control technology in the construction of a contaminant source. They do not, however, necessarily mandate the *best* control technology. The requirement is clarified and limited by three important words, "known", "available", and "reasonable". As the PCHB concluded, these standards impose limitations of practicality and reasonableness on the agency's discretion. This is consistent with SWAPCA's statement of purpose which provides:

> It is hereby declared to be the public policy of the Southwest Air Pollution Control Authority to maintain such a *reasonable* degree of purity of the air as will protect human health and safety and *to the greatest degree practicable,* prevent injury to plant and animal life or to property and be *consistent with the economic and industrial wellbeing of the territory of the Authority.*

(Italics ours.) SWAPCA Reg. 1, § 1.01(b). *Cf.* RCW 70.94.011.

The terms "known" and "available" indicate that SWAPCA may not require an applicant to develop new

63, 517 P.2d 289 (1973); *Elizondo v. Department of Revenue,* 194 Colo. 113, 570 P.2d 518 (1977); K. Davis, *Administrative Law Text* §§ 2.08, 2.10 (3d ed. 1972).

technology to advance the art of emission control. The "advance" must be "known" in the sense that it has been tested and found to control emissions effectively and efficiently. Under this test SWAPCA may not insist that an emission source be utilized as a proving ground for as yet untried control technology. An applicant must, however, incorporate into its proposal those control systems previously developed and presently available.

The agency's discretionary enforcement power is further circumscribed by the requirement of "reasonableness". Under this limitation, a control system must be both economically and technologically feasible. SWAPCA may not require a system which would impose an unreasonable financial burden on the applicant because of excessive initial outlay or annual operating costs. Nor may SWAPCA impose restrictions which are unreasonable in other respects. For example, a system moderately more efficient in controlling emissions might be "unreasonable" if it substantially impeded plant production. Similarly, a system efficient in controlling emissions that could remain operative only with frequent, extensive and expensive maintenance work might be beyond the scope of this standard. Many other factors might be relevant in determining the reasonableness of available systems. These are matters for the expertise of SWAPCA and the PCHB with ultimate review in the courts pursuant to the administrative procedures act. RCW 34.04.130.

Weyerhaeuser argues that other regional air pollution control authorities apply single number emission standards to new sources. We recognize that numerical standards simplify compliance determinations. Under the SWAPCA regulation, an application may be rejected if emission standards would be violated *or* if advances in the art are not incorporated. Although specific numerical standards incorporating an advances in the art criterion may assist the planning efforts of applicants, we do not believe that a regional air pollution control authority must be restricted to such standards.

In view of the limitations imposed by the words "known, available and reasonable", we find that the standards are adequate to guide and limit the exercise of SWAPCA's discretion. Weyerhaeuser concedes that the test of reasonableness here "logically gives rise" to the consideration of particular relevant factors. This should be contrasted with *Maryland v. Environmental Protection Agency*, 530 F.2d 215 (4th Cir. 1975), for example, in which an agency requirement that a program submitted be "adequate" was held impermissibly vague because it did not put applicant on notice as to the factors which would be considered. We believe the standards here, although not precise, are sufficient to notify Weyerhaeuser and other applicants of SWAPCA's general requirements and to satisfy the requirements of due process.

The standards are also sufficient to enable courts to provide meaningful review. The requirement of "reason" is a familiar one to judges and lawyers. We believe courts can determine its application in this particular area and thereby ascertain whether the delegated authority has been abused.

Weyerhaeuser's second contention is that even if SWAPCA's standards are adequate, SWAPCA's application of those standards in the present case was clearly erroneous and affected by errors of law. RCW 34.04.130(6). In arguing that an error of law affected the decision, Weyerhaeuser notes that under SWAPCA Reg. 1, § 3.03(b), approval may be denied if emission standards would be violated *or* if advances in the art are not incorporated. The provision for issuing orders of prevention in SWAPCA Reg. 1, § 3.03(c), however, refers only to emission sources which fail to meet the "emission standards". Thus, Weyerhaeuser argues an order of prevention cannot be issued based upon the "advances" requirement because it is not an "emission standard".

We recognize the anomaly created by these two sections, but do not agree with Weyerhaeuser's interpretation. Section 3.03(b)–(2) manifests the intent to reject proposals

which do not incorporate "advances". Although the "advances" requirement is an emission control requirement and not an emission standard, the statutory standard of RCW 70.94.152 states that a prevention order shall be issued when an applicant fails to provide "all known available and reasonable means of emission control . . ." Moreover, under RCW 70.94.170 SWAPCA would be obligated to prevent construction by directly enforcing RCW 70.94.152(1), which is concededly equivalent to the regulatory requirement.

Weyerhaeuser also suggests that SWAPCA's action was contrary to RCW 70.94.152(3) which prohibits a control authority from requiring the use of any particular type of equipment. SWAPCA did not insist that a particular system be used, however, but merely suggested that baghouse, wet scrubbers or the equivalent would meet its criteria. We do not agree, therefore, that its decision to prevent construction was affected by error of law.

 Nor do we agree that SWAPCA's application of the standards was clearly erroneous. In reviewing such action, the court must examine the entire record in light of the public policy contained in the legislative act authorizing the decision. *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 552 P.2d 674 (1976). The court may not merely substitute its judgment for that of the administrative agency, however. A decision is "'"clearly erroneous"'" only where the court is "'left with the definite and firm conviction that a mistake has been committed.'" *Ancheta v. Daly,* 77 Wn.2d 255, 259–60, 461 P.2d 531 (1969).

The public policy of the Washington clean air act is set forth in RCW 70.94.011 as follows:

> It is declared to be the public policy of the state to secure and maintain such levels of air quality as will protect human health and safety and comply with the requirements of the federal clean air act, and, to the

greatest degree practicable, prevent injury to plant and animal life and property, foster the comfort and convenience of its inhabitants, promote the economic and social development of the state, and facilitate the enjoyment of the natural attractions of the state. The problems and effects of air pollution are frequently regional and interjurisdictional in nature, and are dependent upon the existence of urbanization and industrialization in areas having common topography and recurring weather conditions conducive to the buildup of air contaminants.

The unchallenged findings of the PCHB indicate that alternative control systems available to Weyerhaeuser would reduce the potential emission level from 1/100th to 1/400th of that released by the proposed cyclonic separators. Weyerhaeuser's proposed system would be significantly less efficient than other known and available systems. Even though emissions from Weyerhaeuser's proposed project may not cause a health hazard at the current time, construction of any *new* source in the region contributes toward the point at which relevant standards are exceeded. Thus, while the immediate need for the more efficient system at the Longview plant may not be imperative, continued improvement of air quality in the region will permit further industrial development without creating a health hazard. This is consistent with the stated policy of achieving air quality while promoting the economic development of the state.

The proposed system does have some advantages over those recommended by SWAPCA. It would cost $180,000 less to install than the more efficient systems and would cost $16,000 less to operate each year. It would also consume less energy and be more safe to operate. We cannot say, however, that SWAPCA's assessment of the relative costs and benefits of the available systems was clearly erroneous. While we might have balanced the relevant factors in a different way, we are not left with a definite and firm conviction that SWAPCA erred in rejecting Weyerhaeuser's proposal.

Affirmed.

WRIGHT, C.J., ROSELLINI, HAMILTON, STAFFORD, HORO-
WITZ, and DOLLIVER, JJ., and NORDQUIST and RYAN, JJ. Pro
Tem., concur.